**NATIONAL COALITION FOR the HOMELESS, et al., plaintiffs,**

**v.**

**The UNITED STATES VETERANS' ADMINISTRATION, et al., defendants.**

**Civ.A. No. 88–2503–OG.**

United States District Court, District of Columbia.

Sept. 30, 1988.

Fierman, Hays & Handler, Washington D.C., for plaintiffs.

Arthur Goldberg, Elisa Vela, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GASCH, Senior District Judge.

### I. *Background*

This case is before the Court on plaintiffs' motion for preliminary injunction to prohibit the defendants from selling any property eligible for use under section 501 of the Stewart B. McKinney Homeless Assistance Act until they have complied with that section of the Act. The McKinney Act, 42 U.S.C. § 11301 *et seq.*, was intended "to use public resources and programs in a more coordinated manner to meet the critically urgent needs of the homeless." *Id.* § 11301(b)(2). The Act consists of nine titles providing food, shelter, education, training, health services, and housing for the homeless. Section 501 of the Act, codified at 42 U.S.C. §§ 11411–12, sets out a process by which surplus federal property is to be made available to assist the homeless. The statute requires HUD to collect information about federal buildings and real properties "that are described in surveys by the heads of controlling agencies as underutilized." *Id.* § 11411(a). HUD is to identify which of these underutilized properties "are suitable for use for facilities to assist the homeless." *Id.* HUD is instructed to consult with the Department of Health and Human Services (HHS) and the Administrator of General Services (GSA) when developing the criteria for the suitability determination. HUD must then notify the respective agency heads as to which of their properties have been identified as suitable. *Id.* § 11411(b). Within thirty days, the agency heads must either declare the identified property as "excess" to their needs or explain why it is not excess. Finally, HHS and GSA are to make the properties identified by HUD

available to the homeless by the use of leases at least one year in duration. *Id.* § 11411(c).[1]

Plaintiffs are numerous homeless organizations made up of or representing homeless persons, and an individual living in New York City. Plaintiff Association to Benefit Children (ABC) seeks to provide housing, food, day care, and other assistance to homeless children and their families in New York City. Plaintiff Middlesex Interfaith Partnership with the Homeless (MIPH) provides food, shelter, and other services to homeless families in Middlesex County, New Jersey. Plaintiff H.O.M.E. front, made up of homeless and formerly homeless persons in Phoenix, is an advocate for the the homeless. Plaintiff National Coalition for the Homeless is an national advocate for the homeless and a provider of services to the homeless in New York City. Plaintiff John Croft is a homeless man. The defendants are five federal agencies: the Veterans' Administration (VA), the General Services Administration (GSA), the Department of Defense (DOD), the Department of Housing and Urban Development (HUD), and the Department of Health and Human Services (HHS).

Plaintiffs contend that the government agencies have failed to comply with the provisions of section 501. They allege that defendants VA, GSA, and DOD have not conducted the requisite surveys of their properties or identified which of them are underutilized, and that HUD has not collected this information or identified suitable properties. They also maintain that VA, GSA, and DOD have not declared their identified properties as excess or stated why they cannot do so. Finally, defendants GSA and HHS have allegedly failed to make the suitable properties available to assist the homeless.

Defendants maintain that they have complied with the McKinney Act. The Act was signed into law by President Reagan on

---

1. Section 501 also requires the GSA to make quarterly reports, beginning 90 days after enactment of the statute, on the implementation of the statute. The report is to include a list of the properties identified by HUD as suitable, a statement of the agency heads' responses, and a description of the actions taken by HHS and GSA to make the suitable properties available to the homeless. *Id.* § 11411(e).

July 22, 1987. In October, 1987, HUD, in consultation with HHS and GSA, developed the following criteria for determining whether underutilized properties are suitable to assist the homeless:

—Where existing buildings are identified, they should be suitable for overnight shelter or daytime activities (drop-in centers, soup kitchens, etc). Where vacant land is available, it should also be reported. Both should have or be in a condition which minimum renovation would provide safe and sanitary facilities and meet all applicable state and local housing and building codes and licensing requirements in the jurisdiction in which the facility is located.

—Properties should be in locations where they can reasonably be expected to be of use as facilities to assist the homeless. Isolated properties, such as those in national parks remote from where the homeless are located, should not be included on the list.

—Properties should not be in secured facilities, to which the general public is denied access unless alternative access can be provided for the general public without compromising security.

—In addition, agencies should indicate current structure design and use:

Residential ___

Health facility ___

Non–Residential ___

If the property is a non-residential structure, such as an office building or factory, where possible, indicate whether renovations (paid for by state, units of local government or nonprofit homeless services providers) would be possible or warranted for lease purposes.

Letter from HUD Secretary Pierce, Attachment B to Declaration of Morris Bourne, Director of Transitional Housing Staff, HUD.

On December 2, 1987, HUD Secretary Pierce wrote to twenty-six agency heads asking them to review their "property holdings" and submit a list of properties meeting the suitability criteria, which were set out in the letter. The letter also requested a "statement of the agency's intention to declare the property excess ... or the reasons why the property cannot be declared excess." The letter explained that the statute required that this information be provided within thirty days. *Id.*

By the end of January, twenty-four agencies had responded. Eighteen reported that they had no properties available to assist the homeless. One, the DOD, requested additional time to survey its inventory. Five agencies indicated that they had properties available, for a total of nine properties. On February 10, HUD sent these five agencies "a list of criteria to be applied in evaluating the suitability" of the identified properties. Letter from Secretary Pierce, Attachment D to Bourne Declaration. On March 1, the DOD reported that it had three properties available. On April 5, HUD notified GSA that it had twelve suitable properties available.[2] Letter from Lawrence Goldberger, Director, Office of Elderly and Assisted Housing, HUD, Exhibit E to Bourne Declaration. The GSA has since made four of these properties available to assist the homeless.[3] Declaration of Marjorie Lomax, Director of Policy and Planning Division, Federal Property Resources Service, GSA. At least half of the remaining eight properties will not be made available: three properties were withdrawn as being unsuitable, one was withdrawn for further federal use, the three DOD properties have not yet been released by the DOD, and one property is awaiting action from the Office of Management and Budget. On July 8, HUD again requested agencies to review their property listings and report suitable properties. Another eight properties have been identified, and HUD expects to further evaluate their suitability and report those which are suit-

---

2. The nine properties identified in addition to the three from the DOD were two by HHS, two by the Department of Education, one by the Federal Emergency Management Agency (consisting of 400 mobile trailers), one by the Department of Labor, and three by GSA.

3. Two of these properties are currently being used as shelters. Homeless sponsors have not yet been found for the other two. Lomax Declaration.

able to the GSA by October 21, 1988. Bourne Declaration.

## II. *Reviewability*

Defendants' actions are reviewable under the Administrative Procedures Act. *See* 5 U.S.C. § 706. Where, as here, an agency has a statutory obligation to act, section 706(1) instructs the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *See Public Citizen Health Research Group v. FDA,* 740 F.2d 21, 32 (D.C.Cir.1984); *Equal Employment Opportunity Comm. v. Liberty Loan Corp.,* 584 F.2d 853 (8th Cir.1978). The rationale for the defendants' actions in this case is attributable to their interpretation of the McKinney Act. It is settled that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781–2782 n. 9, 81 L.Ed.2d 694 (1984). If Congress has not spoken to the question at issue, however, the proper standard of review is whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2781–2782; *International Union, UAW v. Brock,* 783 F.2d 237, 245 (D.C.Cir.1986). The Court reviews the defendants' actions with these principles in mind.

## III. *Standing*

■ Defendants argue that plaintiffs lack standing to raise their claims. Plaintiffs must show "a fairly traceable causal connection between the claimed injury and the challenged conduct" and a " 'substantial likelihood' that the relief requested will redress the injury claimed." *Duke Power v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 75 n. 20, 98 S.Ct. 2620, 2630, 2631 n. 20, 57 L.Ed.2d 595 (1978). Defendants contend that plaintiffs' homelessness was not caused by them and is unlikely to be redressed even if the requested relief is granted. The Court finds that plaintiffs' declarations convincingly demonstrate a causal connection between their inability to find housing and the defendants' failure to implement the McKinney Act. Moreover, this injury would be redressed by an order requiring defendants to comply with the Act. *See Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Lee v. Pierce,* 698 F.Supp. 332 (D.D.C.1988); *Bruce v. Department of Defense,* Civ. No. 87–0425 (D.D.C. June 17, 1987) [available on WESTLAW, 1987 WL 13140].

## IV. *Discussion*

A preliminary injunction is properly issued upon a showing by the plaintiffs: (1) of a strong likelihood of success on the merits; (2) that without an injunction they will be irreparably harmed; (3) that the injunction will not substantially harm other interested parties; and (4) that the public interest favors an injunction. *WMATC v. Holiday Tours,* 559 F.2d 841, 842–43 (D.C. Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir. 1959) (per curiam).

### A. *Likelihood of success on the merits*

■ Plaintiffs argue that the defendant agencies have not conducted surveys of their properties to identify underutilized properties, have not adequately reviewed their existing surveys, and have not taken the additional steps required to make underutilized properties available to assist the homeless. Before considering the merits of those arguments, however, the Court takes note that HUD's method of collecting information and identifying suitable properties is not consonant with the statute. This failure to follow the letter of the statute has undoubtedly contributed to the misapplication of the statute complained of by the plaintiffs. Section 501(a) provides that HUD "shall collect information about properties ... described ... by the heads of controlling agencies as underutilized and shall identify which of those ... are suitable" to assist the homeless. 42 U.S.C. § 11411(a). In practice, HUD has asked agencies to identify suitable properties rather than collecting lists of underutilized properties and making the suitability deter-

mination itself. This practice is reflected in nearly every document submitted by the parties involving the identification of suitable properties. For example, Secretary Pierce's initial letter on December 2 requested that agencies "submit listings of properties which meet the aforementioned [suitability] criteria." Pierce Letter, Attachment B to Bourne Declaration. The declaration submitted in this case by the HUD official responsible for implementing the McKinney Act confirms that this is HUD's practice: "HUD sent letters ... requesting ... a listing of [the agencies'] underutilized real property that would be suitable ..." Bourne Declaration. The questionnaire HUD sent to further evaluate the suitability of the properties again required the controlling agencies to make that evaluation. The heart of the questionnaire is questions two and three, which ask whether the building is suitable as a shelter or for daytime activities, and why. Questionnaire from HUD, Attachment D to Bourne Declaration. The responses of the respective agencies confirm that the agencies, not HUD, made the suitability determination. The Navy, for example, was "unable to identify any facilities that would be suitable." Declaration of Steven Klienman, Director of Homeless Assistance Program, DOD. The VA, too, had "no available or suitable excess VA properties." Declaration of Dr. John Gronvall, Chief Medical Director, VA.

Neither the statute nor the legislative history explain why Congress chose to have HUD, not the agency heads, make the suitability determination.[4] Perhaps Congress expected that agencies would be reluctant to divest themselves of properties, and since the likely consequence of finding

property suitable is the release of the property, selected HUD to make the determination. Perhaps Congress believed that having twenty-five agencies, rather than one, decide whether properties are suitable would lead to inconsistent determinations and not allow any one agency to develop expertise.[5] In any event, HUD is not free to ignore the statute's unequivocal command that it "shall" identify suitable properties. *Amalgamated Transit Union Int'l v. Donovan,* 767 F.2d 939, 944 (D.C.Cir. 1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986); *Association of American R.R. v. Costle,* 562 F.2d 1310, 1312 (D.C.Cir.1977).

Plaintiffs argue that the defendants have not considered many federal properties that are not presently subject to a survey requirement. Defendants reply that the McKinney Act does not require new surveys; therefore, property that is not presently surveyed under some other provision of law is excluded from the Act's provisions. The Court agrees. The legislative history of the Act makes clear that section 501(a) refers only to surveys "conducted pursuant to existing law." H.Conf. Rep. No. 174, 100th Cong., 1st Sess., 85 (1987), U.S.Code Cong. & Admin.News 1987, pp. 362, 464 (Stewart B. McKinney Homeless Assistance Act). The absence of appropriations to conduct surveys is further evidence that Congress intended that no new surveys be undertaken. Thus, only those properties which have been surveyed are subject to the Act.[6]

Plaintiffs contend that the defendants have also failed to consider most of the properties which are surveyed. The defendants concede that many surveyed prop-

---

**4.** If the language in subsection (a) did not make it plain that HUD is to determine suitability, the requirement in subsection (b)—that HUD notify each agency when "the Secretary [of HUD] has identified" any property of the agency as suitable—leaves no doubt as to where that responsibility lies. *See* 42 U.S.C. § 11411(b); *see also id.* § 11411(e)(1).

**5.** The type of expertise employed in the suitability determination is evident from the questionnaire HUD prepared. For example, question four asks whether property is located where a

demand for shelter has been identified. Knowing the demand for shelter in a particular location is precisely the type of information more easily assimilated by one agency than twenty five.

**6.** A significant block of properties affected by the Court's conclusion on this issue is the VA's single-family housing inventory, which is not subject to a survey requirement, and thus not subject to the McKinney Act. *See* 41 C.F.R. § 101–3.203(a).

erties have been excluded from consideration, but argue that these properties are excluded from the McKinney Act by the statute governing property disposition, the Federal Property and Administrative Services Act of 1949 (FPASA). *See* 40 U.S.C. § 471 *et seq.* FPASA provides that agencies are to continuously survey[7] properties under their control to determine which are excess, and promptly report excess properties to the GSA. The GSA offers excess properties to other federal agencies, and if there is no federal use, the property is labeled surplus and may be disposed of in a number of ways, including by sale.[8] *Id.* § 484.

■ GSA contends that properties disposed of under FPASA are not affected by the McKinney Act.[9] *See* Lomax Declaration, ¶ 6 (underutilized properties are "unlike properties reported excess to GSA"). Defendants cite the following language in section 501(c) of the McKinney Act in support of their contention: HHS and GSA "shall, in accordance with other applicable federal law, take such actions as may be necessary to make buildings and property identified under subsection (a) available" to the homeless. 42 U.S.C. § 11411(c) (emphasis added). Defendants suggest that the underlined phrase excludes all properties from the Act that are subject to disposition under any other statute, including FPASA. That is an untenable interpretation, since virtually *all* federal property is subject to FPASA and therefore excluded from the McKinney Act. Although defendants have excluded many properties from consideration on this ground, they have not consistently adopted it. For example, many of the twelve properties already identified as suitable by the defendants apparently were also FPASA properties. Defendants also assert that the "underutilized" properties identified pursuant to the McKinney Act are not unused properties, and are not the same "excess" properties to be reported under FPASA. Although the McKinney Act does not define "underutilized" property, defendants contend that the Act incorporates the definition of that term contained in GSA regulations under FPASA. The regulations provide that "unneeded" (i.e., excess) property is that which is "not utilized," "underutilized," or "not being put to optimum use." 41 C.F.R. § 101-47.801(a) (1987). Defendants argue that by selecting the term "underutilized," Congress intentionally excluded "not utilized" property and property "not being put to optimum use."

As evidence that Congress had the GSA's regulatory definition in mind, defendants note that Congress was aware that property surveys are conducted pursuant to FPASA. *See* H.Conf.Rep. No. 174, 100th Cong., 1st Sess., p. 85, U.S.Code Cong. & Admin.News 1987, p. 464 ("The conferees expect that controlling agency heads will

---

7. The regulations promulgated under FPASA differ slightly from the Act's provisions. The regulations require that each executive agency "make an annual *review* of its property holdings" to identify "property that is not utilized, is under utilized, or is not being put to its optimum use." 41 C.F.R. § 101–47.802(a). Another section provides that each executive agency "shall *[s]urvey* real property under its control at least annually to identify property which is not needed, underutilized, or not being put to optimum use." *Id.* § 101–47.202–2(a). Another regulation requires GSA to "conduct, on a continuing basis, *surveys* of real property holdings of all Executive agencies to identify properties which ... are not utilized, are underutilized, or are not being put to optimum use." *Id.* § 101–47.802(b).

8. "Excess" property is defined by FPASA as that which is not needed by the controlling agency. 40 U.S.C. § 472(e). "Surplus" property is excess property not needed by any federal agency. *Id.* § 472(g).

9. In addition to arguing that the pool of properties considered under the McKinney Act is distinct from set of properties subject to FPASA, defendants have, paradoxically, contended that properties identified under the McKinney Act are also considered for disposal under FPASA as follows: when GSA evaluates the best use of surplus property (identified under FPASA), and that property has also been identified as suitable (under the McKinney Act) and HHS has requested that it be leased to the homeless under section 203(k) of FPASA, GSA has the discretion to assign the property to HHS. Lomax Declaration, ¶ 4. If, as defendants contend elsewhere, only unutilized property is reported to GSA, and only underutilized property is reported under the McKinney Act, this simultaneous evaluation will never occur.

carry out the surveys and related actions required under existing law, particularly section 202(b) of [FPASA] with vigor and with special awareness of the urgent need" to assist the homeless). However, this reference in the legislative history to surveys conducted pursuant to FPASA is woefully inadequate to support the contention that the narrow regulatory definition of underutilized was incorporated into the McKinney Act. The defendants' construction ignores the plain language of section 501, arbitrarily restricts the scope of the statute, and would lead to absurd results if it were actually applied.[10] Section 501 is designed to make surplus federal property available to assist the homeless; it is entitled "Identification and Use of *Surplus* Federal Property" (emphasis supplied). Subsection (d) refers to the lease of *surplus* property. Surplus property, under FPASA and by its ordinary definition, includes excess property. It does not exclude vacant, unused properties. Yet the defendants' interpretation of the statute excludes vacant—"not utilized"—properties. *See* 41 C.F.R. § 101–47.801(a)(1) (properties "not utilized" are those "not occupied"). It is extremely improbable that Congress deliberately chose "underutilized" with the FPASA regulations in mind. The regulations define "underutilized" as:

> an entire property or portion thereof . . . used only at irregular periods or intermittently by the accountable executive agency . . . or . . . used for current program purposes that can be satisfied with only a portion of the property.

41 C.F.R. § 47.801(a)(2). It unreasonable to suggest that Congress chose to lease to the homeless half-empty properties and properties which are used part of the time, but not properties which are wholly unoccupied. Again, a glance at the twelve properties identified thus far demonstrates that defendants have not uniformly adopted the position that only underutilized properties can be considered. Many of the properties are technically "unutilized," not "underutilized."

To justify their implementation of the statute, defendants have taken the extraordinary position that "excess" property does not include "underutilized" property.[11] As counsel for defendants explained at oral argument on this motion, "[e]xcess is a designation given to property that is unutilized, not underutilized." Transcript of hearing on motion for preliminary injunction, p. 14. But the very FPASA regulations that defendants assert to be dispositive clearly include underutilized property as one of three types of excess property.[12] *See* 41 C.F.R. § 101–47.801. Defendants' definition is also at odds with the McKinney Act, which requires agencies to declare their "underutilized" property as "excess" (or explain why they cannot do so). 42 U.S.C. § 11411(b). But the defendants are not daunted by this apparent contradiction. GSA Commissioner Earl Jones explained that although subsection (b) "uses the words 'excess property' in lieu of underutilized . . . we have interpreted this to mean underutilized properties for purposes of implementing the law." Jones letter, Attachment 4 to Lomax Declaration. The GSA

---

**10.** Defendants have failed to comply with the Act even under this narrow definition. Properties falling within the regulatory definition of "underutilized" are not being reported. For example, the Air Force explained that property "not needed" is reported to GSA and is not available for consideration under the McKinney Act. Letter from Tidal McCoy, Assistant Secretary of the Air Force, Exhibit P to Supplemental Declaration of Maria Foscarinis. However, underutilized property is defined in the FPASA regulations as property "not needed," and thus should have been reported to HUD. *See* 41 C.F.R. § 101–47.801(a).

**11.** For example, the defendants concede that property sought by the defendants in New Jer-

sey was reported as excess, but contend that it is not available under the McKinney Act because it "has not been listed as underutilized." Defendants' Opposition at 24–25. GSA policy is that McKinney Act properties "will be underutilized and *not*, strictly speaking, excess." Letter from Earl Jones, Attachment 4 to Lomax Declaration.

**12.** FPASA defines excess property as property "not required for [the agency's] needs." 40 U.S. C. § 472(e). The regulations set out three classifications of "unneeded" (i.e., "excess") property: "not utilized" property, "underutilized" property, and property "not being put to optimum use." 41 C.F.R. § 101–47.801(a).

clearly is not at liberty to substitute its own terms for the statutory language.

It is clear that properties reported to GSA as excess pursuant to FPASA are not being evaluated for their suitability to assist the homeless—not by HUD, not by GSA, and not by the reporting agency. *See* Lomax Declaration. For example, defendant DOD explained to HUD that when it reviewed its properties for suitable candidates, it did not consider its "surplus property" because its surplus (presumably DOD meant excess) was reported to GSA. DOD had the mistaken impression that the GSA would report these properties to HUD: "[surplus] properties are routinely reported to [GSA] for disposal. GSA may then make these surplus properties available as homeless shelters in accordance with the McKinney Homeless Assistance Act." Letter to HUD from DOD, Attachment E to Kleinman Declaration. Defendant GSA did not provide a list of these excess properties to HUD.[13]

■■ In light of the above, the Court finds that the defendants have failed to comply with the initial step of the section 501, identification of suitable property. Because so few properties have been identified, there have been few opportunities for defendants to implement the subsequent statutory steps. Twelve properties have been identified as suitable to assist the homeless. After being designated as suitable more than six months ago, only four of the twelve properties have been made available to assist the homeless. Three of the properties have not been released by defendant DOD even though they have been declared suitable. The statute, however, requires that the properties be released (or an explanation be given) within thirty days of being declared excess. 42 U.S.C. § 11411(b). At least half of the properties will not be made available. Yet the statute provides in no uncertain terms that after properties are designated as suitable, HHS and GSA "shall ... take such actions as may be necessary to make buildings and property identified ... available ... to assist the homeless." 42 U.S.C. § 11411(c). Thus, even though only twelve properties have been identified, there is ample evidence that defendants' have failed to take the actions required after properties are identified.

In conclusion, the Court is persuaded that the defendants are not properly implementing the Act. Pitifully few of the numerous unused federal properties are being evaluated for their suitability to assist the homeless. Those that are found to be suitable are not being made available to homeless providers. Plaintiffs have demonstrated the requisite likelihood of success on the merits.

### B. *Irreparable injury*

Plaintiffs allege that they will be irreparably injured if a preliminary injunction is not issued. They assert that defendants' actions deny them access to facilities they sorely need. The sought-after facilities can provide housing, day care, sanitary eating conditions and other basic human necessities. Plaintiffs will be irreparably harmed in the absence of an injunction, they claim, because properties sold by the defendants are forever lost to them. They assert that the serious nature of their injuries is exacerbated by the approaching winter. Defendants argue that an injunction will not immediately relieve plaintiffs' injuries due to the lengthy process of identifying suitable properties.[14]

The Court holds that plaintiffs have shown that they will be irreparably injured unless an injunction is issued. The McKinney Act leaves no doubt that "the Nation faces an immediate and unprecedented cri-

---

**13.** GSA also suggests that the properties reported to it as excess pursuant to FPASA do not fall within the McKinney Act because the reporting agencies, not the GSA, control the property within the meaning of section 501(a). Defendants' Opposition at 25. However, as the letter from the DOD to HUD demonstrates, the reporting agencies are under the impression that the GSA controls the property and should be report-

ing it. What is significant is that this enormous pool of unused property is not being evaluated under the McKinney Act.

**14.** The delays cited by the defendants are all the more reason to grant injunctive relief, since the Act will expire in 1990 without further congressional action. 42 U.S.C. § 11319.

sis due to the lack of shelter for a growing number of individuals and families, including elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301. An avowed purpose of the Act is "to meet the critically urgent needs of the homeless." *Id.* It is axiomatic that properties sold by defendants are not available to assist the plaintiffs. Defendants have interpreted the Act to exclude almost all unused federal properties from consideration under the McKinney Act, including the unused properties disposed of pursuant to FPASA. In the absence of an injunction, defendants will continue to sell FPASA properties without considering their suitability to assist the homeless. There is a limited supply of suitable federal property. Because locating properties in suitable locations appears to be a primary impediment to assisting the homeless, any suitably located properties currently in defendants' inventories are especially valuable. In the absence of an injunction, a favorable judgment for plaintiffs might well be a hollow one due to a lack of suitable properties to afford any meaningful relief.

### C. *Harm to defendants and the public interest*

Defendants argue that injunctive relief would halt the receipt of proceeds, over $100 million annually, arising from the sale of government properties. Plaintiffs contend that this is a relatively insignificant amount of funds to the government, and that monetary injury is, by definition, less weighty than the personal injuries they are suffering. They also note that properties leased to homeless providers will be available for sale upon termination of the leases. The Court finds that on balance, the public interest and the minimal harm to the defendants supports the issuance of an injunction.

### V. *Conclusion*

Plaintiffs have demonstrated the requisite likelihood of success on the merits of their McKinney Act claim. The language of the statute simply does not support the extremely narrow construction the defend-

ants have adopted. Plaintiffs have also shown that they will be irreparably injured in the absence of an injunction. The Court holds that an injunction would further the public interest and result in *de minimis* injury to defendants.

### ORDER

Upon consideration of plaintiffs' motion for preliminary injunction, the oral arguments of counsel in open court, the entire record herein, and for the reasons stated in the accompanying Memorandum, it is by the Court this 30th day of September, 1988,

ORDERED that defendants the Veterans' Administration, the General Services Administration, the Department of Housing and Urban Development, the Department of Defense, and the Department of Health and Human Services, and all persons acting by, through, or under them, or subject to their control or supervision, be, and hereby are, enjoined from selling or otherwise disposing of any property eligible for use under section 501 of the McKinney Act, except for property for which a sales contract has been executed or property being made available to assist homeless persons, until they have complied with the terms of section 501 of the McKinney Act in accordance with the Memorandum accompanying this Order.