NATIONAL LAW CENTER ON HOME-
LESSNESS AND POVERTY, et
al., Plaintiffs,

and

National Union of the Homeless, et
al., Intervenors,

v.

UNITED STATES VETERANS
ADMINISTRATION, et al.,
Defendants.

Civ. A. No. 88–2503 (OG).

United States District Court,
District of Columbia.

Feb. 13, 1991.

On Motion to Alter or Amend
May 2, 1991.

Jeffrey Pash, D. Scott Coward, Washington, D.C., for plaintiffs.

Arthur R. Goldberg, Mary E. Magee, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

On December 14, 1988, this Court granted summary judgment and permanent injunctive relief for plaintiffs. *National Coalition for the Homeless v. Veterans Administration*, No. 88–2503, 1988 WL 136958 (D.D.C. Dec. 14, 1988) (*"Permanent Injunction Decision"*). Plaintiffs have now moved this Court for a further order enforcing the Court's permanent injunction of December 12, 1988, and remedying other violations of the Stewart B. McKinney Homeless Assistance Act.

Specifically, plaintiffs seek an order from this Court directing: (i) that the Department of Housing and Urban Development ("HUD") canvass landholding agencies every quarter and report all unutilized, underutilized, excess, and surplus properties in their possession, regardless of whether the property had been previously reported; (ii) that HUD notify landholding agencies of suitability determinations within 72 hours from the time suitability determinations are made; (iii) that HUD revise its canvassing letter to clearly state that HUD, and not the responding landholding agency, is to make all suitability determinations; (iv) that HUD shall publish in the *Federal Register* lists of properties that are both suitable *and* available; (v) that the General Services Administration ("GSA") cease interfering with the efforts of homeless providers to acquire property; (vi) that the Department of Health and Human Services ("HHS") revise the requirements of its environmental questionnaire and develop criteria for excluding certain classes of applications from environmental review; (vii) that the defendants, in making environmental assessments, use information that is within their possession to the maximum extent possible; (viii) that HHS approve applicants that identify Title IV of the McKinney Act as a prospective source of funds; (ix) that defendants establish necessary and meaningful outreach programs; (x) that defendants modify their monthly reports to include lists of all canvassing letters sent during the month, all responses to canvassing letters, all notifications from HUD regarding the suitability of property reported to it, all determinations made by landholding agencies pursuant to Section 501(b) of the McKinney Act, all letters of intent submitted to HHS, and all requests for extension of time submitted to HHS.

## I. BACKGROUND

### A. *McKinney Act*

In passing the McKinney Act, Congress found that the federal government "has a clear responsibility and an existing capacity" to help meet "an immediate and unprecedented crisis due to the lack of shelter for a growing number of individuals and families." 42 U.S.C. §§ 11301(a)(1), 11301(a)(6). Thus, as part of the McKinney Act, Section 501 (also known as Title V), codified at 42 U.S.C. § 11411, was enacted to provide a program for addressing what Congress found to be the greatest obstacle facing organizations providing help to the homeless—"the lack of suitable buildings to serve as shelters." H.R.Rep. No. 10, 100th Cong., 1st Sess., pt. 1, at 17 (1987), U.S. Code Cong. & Admin.News 1987, p. 362.

Section 501 addresses this problem by establishing a procedure for making vacant federal properties available to assist the homeless. First, HUD collects information about properties that are described as unutilized or underutilized by the agency controlling the properties. 42 U.S.C. § 11411(a). After collecting the information, HUD must then determine which of the unutilized or underutilized properties "are suitable for use for facilities to assist the homeless." *Id.* After a property has been determined by HUD to be suitable,

the controlling agency has thirty days to either (i) declare the property "excess" to the agency's need, (ii) make the property available for interim use, or (iii) provide a statement explaining why the property cannot be declared excess or made available on an interim basis. *Id.* § 11411(b).

Once the property is declared "excess" to the agency's need, HHS and GSA "shall, in accordance with other federal law, take such action as may be necessary to make buildings and property ..." available to organizations assisting the homeless. *Id.* § 11411(c). The Court has construed this language to mean that "excess" properties may, but need not be, offered to other federal agencies prior to being made available to assist the homeless. *Permanent Injunction Decision* at 25. Finally, "excess" properties are made available to homeless organizations through leases lasting at least one year. 42 U.S.C. § 11411(d)(1). Properties not designated as "excess," but which are available for interim use, may be made available either by a lease lasting at least one year or by a permit. *Id.* § 11411(d)(2).

### B. *Permanent Injunction*

On December 14, 1988, this Court granted summary judgment and permanent injunctive relief for the plaintiffs. The Court found that the defendants had failed to comply with the requirements of the Act and that injunctive relief was necessary to "remedy past violations and prevent future violations." *Permanent Injunction Decision* at 19. Among the relief granted, the Court ordered (i) HUD to publish on a weekly basis a list of suitable properties in the *Federal Register*, (ii) the defendants to prevent suitable properties from becoming available for any other purpose for at least 30 days, (iii) HHS to complete its action on an application within 15 days of receiving a completed application, (iv) HUD to canvass all landholding agencies quarterly to collect information about unutilized or underutilized property, and (v) the defendants to publish monthly reports.[1] *National Coalition for the Homeless v. Veterans Administration*, No. 88–2503, 1988 WL 136970 (Order of December 14, 1988) ("Permanent Injunction").

In addition, the Court's Permanent Injunction retained jurisdiction

> for the purposes of enabling any of the parties to seek further orders or directions as may be necessary or appropriate for the construction or carrying out of this Decree, for the modification of any provision thereof, for the enforcement of compliance and punishment of violations thereof, and to determine the costs and attorneys' fees that may be recoverable by plaintiffs.

*Id.* at 4.

### C. *McKinney Act Amendments*

Since plaintiffs filed their motion for further injunctive relief, Congress has amended the McKinney Act. *See* Pub.L. No. 101–645 (to be codified at 42 U.S.C. § 11411 *et seq.*) ("1990 Amendments"). These amendments become effective on February 27, 1991. *See* 1990 Amendments, Section 401(b).

The amendments codify much of the Court's Permanent Injunction with a few modifications to the procedures defendants are required to follow. The Court believes that the amendments will require the court to modify its Permanent Injunction so that it does not conflict with the 1990 Amendments.[2] Once the 1990 Amendments become effective, the Court will have the parties brief this issue.

The parties both agree that the 1990 Amendments resolve only one of the issues

---

**1.** These reports require HUD to identify the properties that have been determined suitable, the properties that have been determined unsuitable and the reasons therefor, and the properties that have been sold, transferred, or otherwise disposed of.

**2.** In addition, the defendants have indicated that they will move the Court to vacate its injunction once the amendments become effective. Since no briefing has been done, the Court expresses no opinion on this issue. If defendants seek to vacate the injunction, the Court will consider the issue at the same time it addresses whether modifications to the permanent injunction are necessary to avoid conflict with the 1990 Amendments.

in plaintiffs' motion. The 1990 Amendments provide plaintiffs with their request that the defendants list in the *Federal Register* only those properties that are both suitable *and* available. The defendants had, in fact, agreed to this request prior to the passage of the 1990 Amendments.

The defendants, at a status call on January 3, 1991, sought to have the Court stay its decision on the remaining issues. The defendants indicated that the remaining issues in plaintiffs' motion would be addressed in the regulations that are being promulgated pursuant to the 1990 Amendments. The defendants, however, have had over three years to issue regulations implementing the McKinney Act. Only now, when required by the 1990 Amendments, have the defendants begun to promulgate regulations. In addition, given the defendants' past pattern of delay in implementing the requirements of the McKinney Act, the Court is unconvinced that the issues raised in this motion will be promptly resolved by the defendants. The Court, therefore, will not stay its decision until the defendants have promulgated regulations.

In reaching its decision on the relief that is requested by plaintiffs, the Court is mindful, however, not to become too involved in the details that are properly the domain of the defendant agencies. The Court simply seeks to have defendants fulfill their statutory obligations to take whatever actions are necessary to make excess properties available to the homeless. Thus, where possible, the Court will seek to delineate the defendants' obligations under the McKinney Act, leaving the details for the defendants to resolve within the administrative process.

## II. FACTS

The complete failure of defendants to comply with the requirements of the McKinney Act, which resulted in the Court granting permanent injunctive relief for the plaintiffs, is set out in the Court's prior decisions, and need not be repeated here. *See National Coalition for the Homeless v. Veterans Administration*, 695 F.Supp. 1226, 1227–29 (D.D.C.1988); *Permanent Injunction Decision*, at 10–15. The defendants, however, now contend that they have remedied their prior deficiencies. In their brief, they state that plaintiffs' evidence supporting a modification of the Permanent Injunction is based on "isolated, anecdotal and largely stale facts." Defendants' Opposition at 1.

The evidence of how well the process is presently working is set out in plaintiffs' brief and is not contested by the defendants. Plaintiffs indicate that a total of 3,382 properties have been determined to be suitable for use by the homeless. Plaintiffs' Memorandum at 2. Between July 1988 to February 1990, 522 inquiries were made regarding the use of these properties. *Id.* Of these inquiries, 22 resulted in property actually being made available to the homeless. *Id.*

The above evidence indicates an improvement since the Court's decision to issue a Permanent Injunction. At that time, only four properties had been made available to assist the homeless, and only two properties were actually being used to assist the homeless. *Permanent Injunction Decision* at 11.

However, despite this improvement, the Court concludes that several deficiencies in the defendants' implementation of the McKinney Act have continued to thwart Congress' desire to make federal properties available to assist the homeless. Specifically, the Court finds (i) that HUD's canvassing procedure is not in accordance with the Court's Permanent Injunction; (ii) that the defendants have failed to assist applicants in providing the information that is requested on environmental questionnaires; (iii) that HHS has improperly placed financial restrictions on homeless providers; and (iv) that the defendants' failure to implement an outreach program to publicize available properties continues to hamper the effectiveness of the McKinney Act.

For each of the above findings, the factual basis and the specific relief provided by the Court is described in the Discussion Section of this memorandum.

## III. DISCUSSION

### A. *Authority to Order Further Injunctive Relief*

 A court has the authority to issue further orders to enforce its prior injunction. *Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978). In making such a decision, a court may take into account the compliance with the court's previous orders and the need for a further order to prevent "inadequate compliance" in the future. *Id.* As with the initial injunction, however, an order granting further injunctive relief must also be "narrowly tailored to remedy the specific harm shown." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C.Cir.1976).

The defendants do not dispute the Court's authority to order further injunctive relief. Instead, the defendants contend that they have been complying with the requirements of the McKinney Act and this Court's Permanent Injunction. Defendants' Opposition at 1. Therefore, the defendants assert that no modification of the Court's previous order is necessary, with the exception of the one area where they agree that a modification would be beneficial, which is to publish in the *Federal Register* only those properties that are both suitable and available. *Id.* at 2.

### B. *Requested Relief*

#### 1. Quarterly Canvassing of Landholding Agencies

 The Court's Permanent Injunction requires HUD to "canvass all land-holding agencies quarterly to collect information about unused or underused federal property." Permanent Injunction at 3. In addition, the Permanent Injunction states that the canvass is to include "all property declared excess or surplus and all properties declared unitilized or underutilized...." *Id.*

The plaintiffs contend that HUD is failing to follow this directive. Currently,

HUD conducts a comprehensive canvass only during the first quarter of the year. Plaintiffs' Memorandum at 5. HUD's inquiries in the subsequent three quarters have been limited to properties that have become unutilized or underutilized since the last canvass. *Id.* According to plaintiffs, these canvasses are deficient because the subsequent canvasses are not comprehensive and because two categories of property—excess and surplus—are omitted entirely. *Id.* at 6.

The defendants do not dispute plaintiffs' factual contentions. Instead, the defendants argue that their system of canvassing properties complies with the letter of the injunction. Defendants' Opposition at 8. Defendants assert that the Court's Permanent Injunction does not require a comprehensive canvass every quarter. *Id.* According to the defendants, a comprehensive canvass would waste resources by requiring HUD to make suitability determinations on property that had been determined suitable just three months ago and would merely duplicate the results of one comprehensive canvass. *Id.* at 8–9. In addition, the defendants state that the reason landholding agencies are not canvassed about excess and surplus property is because only GSA retains excess and surplus properties. *Id.* at 13. Once property is determined to be excess, a landholding agency is required to transfer the property to GSA.

The Court finds that its Permanent Injunction requires the government to perform a comprehensive canvass every quarter. The language of the injunction could not be more clear—HUD shall "canvass all land-holding agencies quarterly." Permanent Injunction at 3. Accordingly, four times a year HUD must determine whether or not the landholding agencies have property that is suitable for the homeless. In so doing, the defendants will ensure that property, which remains suitable and available throughout the year, will continue to be obtainable by homeless providers.[3]

---

3. As an example of the problem with not doing a comprehensive canvass each quarter, the plaintiffs cite the case of some vacant property

held by defendant Department of Veterans Affairs. This property, which was suitable for the homeless, was never reported. *See* Plaintiffs'

Moreover, the Court is unconvinced that a quarterly canvass would be unduly burdensome by requiring HUD to make suitability determinations on property that had been determined suitable just three months ago. As long as the property has not undergone any change over the three-month period, HUD should easily be able to make suitability determinations on property that was determined suitable just three months ago.

The Court also finds that the canvass letter should request information on all properties including excess and surplus properties. Although the government contends that agencies other than GSA do not have surplus or excess property, the distinctions between underutilized, unutilized, excess, and surplus may not always be clear to the landholding agency. In addition, it would take little additional effort on the part of HUD to include surplus and excess property on the canvass letter just to ensure that no property is improperly excluded from the process. Defendants, in fact, appear willing to agree on including surplus and excess property. *See* Defendants' Opposition (Forsberg Declaration ¶ 4) (stating that "if less confusion to plaintiffs would result if HUD, in its canvassing letters, requests all four categories of properties, it will do so.").

#### 2. 72 Hour Notification of Suitability Determinations

■ Plaintiffs contend that HUD has been dilatory in notifying landholding agencies of suitability determinations and that such delays burden the homeless. Plaintiffs' Memorandum at 8. As a remedy, plaintiffs seek an order from the Court requiring HUD to notify landholding agencies of suitability determinations within 72 hours of the time the determinations are made. *Id.*

Plaintiffs' only example, however, is a letter from the Army Corps of Engineers that states, "In many instances, we do not receive these [notification] letters for almost two weeks after the date shown on

the letter." *Id.* The Court concludes that this one example is an insufficient factual basis to support the additional relief that plaintiffs request.

#### 3. Suitability Determination

■ The McKinney Act and the Court's Permanent Injunction require that HUD alone make suitability determinations. 42 U.S.C. § 11411(a); Permanent Injunction at 3–4. Despite these requirements, the plaintiffs assert that landholding agencies continue to make suitability determinations. Plaintiffs' Memorandum at 9. As examples, they cite three cases where landholding agencies made suitability determinations. *See* Plaintiffs' Memorandum (Exhibits H, I, & J). Their requested relief is that canvassing letters clearly state that HUD, and not the landholding agency, is to make all suitability decisions. *Id.* at 10.

Defendants respond that any problem that existed with having landholding agencies make suitability determinations has now been corrected. Defendants' Opposition at 16. The defendants assert that landholding agencies have all been notified that they are not to make suitability determinations. *Id.* at 16–17.

Because of plaintiffs' evidence that some landholding agencies have continued to make suitability determinations, even after the Court's Permanent Injunction, the Court finds that HUD must state in their canvassing letters that HUD, and not the landholding agency, is to make the suitability determination. Moreover, the Court concludes that this modification, which will take almost no effort for the defendants to accomplish, will help to prevent landholding agencies from continuing to violate the McKinney Act and the Court's Permanent Injunction by making suitability determinations.

#### 4. Modification of Federal Register Notices

Both parties agree that the Court's Permanent Injunction should be modified to

Memorandum (Toni Reinis Declaration ¶ 5). The defendants indicate that these properties were mistakenly left off of HUD's once a year comprehensive canvass. *See* Defendants' Opposition (Linda B. Tribby Declaration ¶ 7). If HUD properly performed a comprehensive canvass every quarter, this property would likely have been reported the following quarter.

have published in the *Federal Register* only those properties that are both suitable and available. Currently, pursuant to the Court's Permanent Injunction, HUD publishes every week in the *Federal Register* those properties that have been determined to be suitable. Both parties agree that the problem with this approach is that most of the properties that have been determined to be suitable will not end up being made available to organizations providing service to the homeless.[4] A homeless provider might, therefore, end up wasting its time and resources on a property that never becomes available.

However, because Congress has already provided this relief in the 1990 Amendments, *see* 1990 Amendments, Section 501(c), the Court finds it unnecessary to modify its Permanent Injunction at this time. While the Court recognizes that this section of the 1990 Amendments will require a modification of the Court's Permanent Injunction in order to avoid conflict with the statute, the Court will address such a modification when the parties have briefed all the issues regarding the effect of the 1990 Amendments on the Court's Permanent Injunction.

### 5. GSA Interference

The plaintiffs argue that GSA has "continued to identify and exploit opportunities to deny property to the homeless and instead use it for other purposes." Plaintiffs' Memorandum at 12. Specifically, plaintiffs contend that GSA has refused to permit HHS to grant extensions of time for service providers to apply for property and that GSA has interfered with applicants by imposing additional burdens after the application has been approved by HHS. *Id.* at

11–16. The plaintiffs seek an order preventing GSA from playing any role in the application process.

#### a. *Extensions of Time*

■ The Court finds that the evidence presented by plaintiffs does not demonstrate that GSA is improperly interfering in the application process by denying requests for extension of time. Of the 32 requests for extension of time that homeless providers submitted, 26 of the requests were approved. *See* Defendants' Opposition (Ronald L. Rice Declaration ¶ 5). In addition, of the requests that were denied, the Court is satisfied that most of the denials were based on a lengthy delay in meeting the deadline or were the result of unique circumstances.[5]

The Court emphasizes, however, that GSA continues to be under a statutory obligation to "take such action as may be necessary" to make federal property available to homeless providers. 42 U.S.C. § 11411(c). In addition, Congress intended that GSA, because of the "special urgency" of the homeless, give "priority consideration" to making properties available to the homeless. H.R.Conf.Rep. No. 1089, 100th Cong., 2d Sess. 81 (1988), U.S.Code Cong. & Admin.News 1988, pp. 4395, 4465. The Court, therefore, fully expects that GSA will continue, in the vast majority of cases, to approve requests for extension of time.

#### b. *Imposing Burdens After Application is Approved*

■ The one situation plaintiffs identify, where GSA allegedly interfered with a completed application, involved the leasing of several buildings of the Veterans Administration Medical Center in Arkansas to a homeless provider. *See* Plaintiffs' Memorandum (Joe Flaherty Declaration). Plain-

---

4. Most suitable property does not end up available because the landholding agency is not required to give up the property simply because HUD has determined the property to be suitable for the homeless. Within 30 days of the suitability determination, the landholding agency can prevent the property from being made available by providing HUD with a statement explaining why the property cannot be declared excess or made available to the homeless. 42 U.S.C. § 11411(b).

5. For example, a request for an extension of time on a property in Grandy, Massachusetts was denied after no expression of interest had been received for 88 days. Defendants' Opposition (Ronald L. Rice Declaration ¶ 6(D)). The deadline is 30 days. In another case, an extension was denied for a parking garage in New York, New York when it was determined that the garage had been improperly reported as excess when, in fact, it was fully occupied. *Id.* (Ronald L. Rice Declaration ¶ 6(C)).

tiffs contend that GSA imposed several additional unnecessary burdens on the homeless provider. These included requesting the homeless provider to furnish a legal description and requiring the homeless organization to perform an appraisal even though GSA already had the information available. *Id.* (Joe Flaherty Declaration, ¶ 13). In addition, plaintiffs state that GSA sought to modify their application by substituting buildings that needed substantial repair for the buildings requested. *Id.* Plaintiffs acknowledge that these issues were ultimately resolved, but the resolution required intervention by congressional staff members and delayed the signing of the lease by almost one year.

In response, the defendants assert that while they had an appraisal and a legal description of the entire property, they did not have an appraisal or a legal description for the specific portion of the property that plaintiffs requested. *See* Defendants' Opposition (P. Daniel Smith Declaration ¶¶ 12–13). Defendants state that after negotiations with plaintiffs, GSA eventually agreed to bear the cost of performing an appraisal and providing a legal description. *Id.* As far as substituting buildings of the VA Medical Center in Arkansas is concerned, defendants state that the reason this was done is that the homeless provider requested buildings that were widely dispersed across the Medical Center. GSA, therefore, sought to substitute buildings so that all the buildings made available to the homeless organization would be in the same area, and thus the remaining buildings would be more readily available for sale. *Id.* (P. Daniel Smith Declaration ¶ 9).

The Court believes that the above example demonstrates a failure by GSA to "take such actions as may be necessary to make buildings and properties" available to organizations assisting the homeless. 42 U.S.C. § 11411(c). To the extent that GSA had a legal description and an appraisal for the entire property, this information should have been made available to assist the homeless provider. In addition, the Court is unconvinced that GSA sought to make the property available in an expeditious manner. Instead, GSA appears to have unnecessarily prolonged and delayed making the property available.

This one example, however, does not warrant an order from the Court barring GSA from playing any role in the application process. Because GSA has statutory obligations regarding the disposal of federal properties, the Court finds that it would be improper to bar GSA from any role in the process. On the other hand, GSA must meet its obligation "to take such actions as may be necessary to make buildings and properties" available to homeless providers. *Id.* At a minimum, this obligation includes promptly providing information that would aid a homeless provider in making the desired property available to assist the homeless.

### 6. Excluding Classes of Applications from Environmental Review

■ As part of the application process, HHS requires applicants to submit eight pages of environmental information. HHS states on the application that the information is requested pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47. Plaintiffs contend that such information is unnecessary and imposes a hardship on the applicants. As relief, the plaintiffs seek either an order forbidding its use altogether or an order requiring defendants to develop criteria to exclude these applications from environmental review.

#### a. *Forbidding the Use of the Questionnaire*

NEPA requires an environmental impact statement ("EIS") for "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C). The plaintiffs cite two cases, *Nucleus of Chicago Homeowners v. Lynn*, 524 F.2d 225 (7th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) (finding that an EIS was not required for a project involving the construction of low-income housing) and *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421 (5th Cir.1973)

(concluding that an EIS was not required for the construction of a 272–unit apartment complex), as authority that HHS is not required under NEPA to prepare an EIS. In both of these cases, however, HUD had prepared extensive environmental assessments before concluding that an EIS was unnecessary. *See Nucleus of Chicago*, 524 F.2d at 231; *Hiram Clarke Civic Club*, 476 F.2d at 426. The respective courts in these two cases found that HUD's decisions not to perform an EIS were reasonable because of the information compiled in the environmental assessment. *Id.*

The basic point of these two cases is that an agency cannot determine whether or not a particular project is a "major federal action significantly affecting the environment" until some preliminary research has been done. Thus, since the Court cannot categorically conclude that no project under the McKinney Act will be a "major federal action significantly affecting the environment," the environmental questionnaire cannot be eliminated.

### b. *Categorical Exclusions*

NEPA allows agencies to develop criteria for excluding certain actions from the requirement of an EIS or an environmental assessment. 40 C.F.R. § 1508.4. As an example, HUD has granted a categorical exclusion for programs that "do not involve physical change to buildings or sites." 24 C.F.R. § 50.20(*o*). However, even where such an exclusion might be applicable, the agency will, at a minimum, still require basic environmental information from the applicant to determine whether the exclusion applies to the applicant's proposed use. Thus, even if the Court has the power to order an agency to develop categorical exclusions, the exclusions would not be a basis for eliminating the requirement to complete an environmental questionnaire.

### 7. Revised Questionnaire

■ If the Court does not eliminate the environmental questionnaire, plaintiffs request that the Court require that defendants revise the questionnaire. According to the plaintiffs, the current environmental questionnaire is unintelligible, requires information that the government already possesses, and provides no guidance to applicants.

The Court finds that the current questionnaire is flawed. First, the questionnaire contains no explanatory material and lists no person available for providing assistance. *See* Plaintiffs' Memorandum (Exhibit S). As a result, one homeless provider was forced to use a trial and error method of calling every conceivable agency they *thought might be* helpful in explaining the questionnaire. *Id.* (Joe Flaherty Declaration ¶ 9). The defendants' response is that once HHS environmental personnel explain the questionnaire, homeless providers have no trouble supplying the information. Defendants' Opposition (Thomas C. Cloutier Declaration ¶ 16). This statement, however, only emphasizes the need for the questionnaire to provide more explanatory information and a direct reference person.

Second, the Court finds that the questionnaire does not sufficiently make use of the environmental information that is within the defendants' possession. The defendants acknowledge that some of the information requested on the questionnaire is contained in the "suitability checklist" performed by HUD or is available from the landholding agency. The defendants state, however, that HHS cannot provide this information to the applicants because it is not within their possession. This response is completely unsatisfactory in view of HHS' obligation "to take such actions as may be necessary to make buildings and property" available to assist the homeless. At a minimum, HHS should provide the applicants with HUD's "suitability checklist" and establish a procedure for applicants to obtain any environmental information that landholding agencies may have available. At the present time, the application does not even indicate that such records may be available from the landholding agency. In view of the limited budgets and technical expertise of most homeless providers, it is inexcusable that more effort is not made to provide appli-

cants with information that is within the possession of the defendants.

As a remedy, the plaintiffs seek to require the defendants to submit a revised questionnaire for approval by the Court. The Court denies this request. Instead, the Court's order granting further injunctive relief specifies the minimum actions that defendants must take to be in compliance with the McKinney Act. Thus, consistent with HHS's obligation to "take such actions as may be necessary to make buildings and property" available to assist the homeless, the Court's Order granting further injunctive relief finds (i) that HHS must provide with the environmental questionnaire a direct reference person who can provide the homeless provider with assistance on how to complete the questionnaire; (ii) that HHS must provide with the environmental questionnaire information on how applicants can obtain environmental information that is within the defendants' possession; (iii) that HHS must assist applicants in obtaining environmental information that is within the defendants' possession.

### 8. Financial Requirement

■■■ HHS requires that applicants have "the necessary funds, or the ability to obtain funds, to carry out the approved program of use of the property." 45 C.F.R. § 12.8(b)(4). To comply with this requirement, many homeless organizations seek funding through Title IV of the McKinney Act. HHS, however, has refused to accept an intent to seek funding under Title IV as a sufficient financial showing unless the applicant has identified an alternative source of funding.

Plaintiffs assert that such a situation creates a potential "Catch–22" for any organization that does not have an alternative source of funding.[6] An applicant may be denied funds under Title IV because the Title V application has not been approved. However, HHS will not allow a homeless

organization to apply under Title V without Title IV funds. As a remedy, plaintiffs request that the Court order HHS to revise its application guidelines to allow an intent to apply for Title IV funds to satisfy the required financial showing.

Although the McKinney Act does not require an applicant to make any financial showing, the Court recognizes that it is only prudent for defendants to require applicants to make some financial showing. The Court, however, finds no basis for the defendants to require Title IV applicants to also provide an alternate source of funds. The only explanation the defendants provide for HHS's policy is that Title IV funds are limited. This explanation is not satisfactory for requiring an alternative source of funding. If the homeless provider's Title IV application is denied and an alternative source of funds is unavailable, the property can simply revert to GSA.

### 9. Outreach Program

■■■ This Court has previously noted that an "impediment to effective implementation" of the McKinney Act is the lack of "some kind of outreach program" to make homeless providers aware of the properties that are available in their locality. *Permanent Injunction Decision* at 18. Plaintiffs contend that the Court's observation is still true today. As a result, plaintiffs seek an order from the Court requiring defendants to submit for the Court's approval a plan for conducting meaningful outreach.

The defendants, on the other hand, assert that they have been providing meaningful outreach. Along with listing properties in the *Federal Register*, defendants state that they have disseminated information concerning the Title V process by participating in numerous seminars sponsored by the Interagency Council for the Homeless. In addition, HUD indicates that it is initiating a marketing campaign, which will

---

**6.** Plaintiffs provide, as an example, a homeless provider that sought to apply for property that was formerly used by NASA. *See* Plaintiffs' Memorandum (Judith A. Spaulding Declaration). She applied for funding under a HUD

program, but because funding under that program was uncertain, she was unable to apply for the NASA property. Although she eventually received the funding, the NASA property was no longer available.

provide directly to homeless providers information regarding suitable properties.

The Court finds that defendants have failed to conduct a meaningful outreach program. As of the present time, the defendants still do not provide any direct information to homeless providers. This fact was made abundantly clear by the testimony, before the Senate Committee on Governmental Affairs, of Wendy Adler of the National Governors Association. She testified that at an Interagency Council on the Homeless Conference, out of about 300 homeless providers, only ten people were aware of the McKinney Act program, and of those ten, only three knew how to look for the properties in the *Federal Register.* *See* Plaintiffs' Reply (Exhibit F, Testimony of Wendy Adler before the Senate Committee on Government Affairs, July 19, 1990 at 4). A member of defendants' own staff, in fact, acknowledges that one of the main reasons the McKinney Act has failed to accomplish its objective is the absence of an outreach procedure. *See* Defendants' Opposition (February 12, 1990 Memorandum from Anna Kondratas, Assistant Secretary for Community Planning and Development, Attachment 4 to James Forsberg Declaration). Clearly, Congress intended something more in the way of outreach than what the defendants have so far provided. *See, e.g.,* Statement of Rep. Collins, 134 Cong.Rec. H10379 (daily ed. Oct. 19, 1988) (stating that we expect GSA, HHS, and HUD to "immediately institute an outreach program to insure that state and local governments and non-profit groups know of each available piece of property in their localities and how to proceed to obtain it.")

As with the environmental questionnaire, the Court's order granting further injunctive relief does not require the defendants to submit a proposed outreach program for the Court's approval. Instead, the Court finds that at a minimum, the McKinney Act requires the defendants to provide direct information to homeless providers on the properties that are available in their localities. The Court leaves it to the defendants to develop a plan that satisfies this requirement.

### 10. Modification of Monthly Reports

■ The Court's Permanent Injunction requires the defendants to provide monthly reports. These reports include the following information: i) "properties determined suitable by HUD," ii) "properties determined to be unsuitable and reasons therefor," iii) "properties made available to assist the homeless," and iv) "properties sold, transferred, or otherwise disposed of." Permanent Injunction, at 4.

Plaintiffs now contend that this information is insufficient to fully monitor defendants' compliance with the McKinney Act. Plaintiffs, therefore, request the following additional information be included in the monthly reports:

> (1) all canvassing letters sent during the month, including the addresses, and dates on which the letters were sent; (2) all responses to canvassing letters and dates on which they were received by HUD; (3) all notifications from HUD regarding suitability of property reported to it, including the addresses of such determinations and the dates on which they were sent; (4) all determinations made by landholding agencies pursuant to Section 501(b) of the McKinney Act and the dates on which the determinations were made; (5) all letters of intent submitted by HHS; and (6) all requests for extension of time in which to apply submitted to HHS and any response thereto.

Plaintiffs' Memorandum at 27–28.

The Court finds that requiring defendants to compile all this information into a monthly report would be unduly burdensome. Moreover, since the defendants have agreed to allow plaintiffs to have access to all the requested information, the Court believes that the modified report is unnecessary to monitor defendants' compliance under the McKinney Act.

### IV. CONCLUSION

In summary, the Court believes that the defendants' implementation of the McKinney Act has improved since the Court is-

sued its Permanent Injunction. The defendants, however, still do not appear to be serious about their obligation and responsibility to "take such actions as may be necessary to make" vacant federal properties available to assist the homeless. As a result, the Court finds it necessary to again issue injunctive relief to require the defendants to comply with their statutory responsibility.

## ORDER

Upon consideration of plaintiffs' motion for further injunctive relief, defendants' opposition thereto, the arguments of counsel in open Court and the entire record herein, and for the reasons set forth in the accompanying Memorandum, it is by the Court this 13th day of February, 1991,

ORDERED that the plaintiffs' motion be, and hereby is, granted in part, and denied in part; and is further

ORDERED that defendants must take the following actions to be in compliance with the Court's Permanent Injunction and Section 501 of the McKinney Act:

(1) HUD must during each quarter perform a comprehensive canvass to determine whether landholding agencies have property that is unutilized, underutilized, excess, or surplus.

(2) HUD's canvassing letters must indicate that HUD, and not the landholding agency, is to make all suitability determinations.

(3) HHS must provide with the environmental questionnaire a direct reference person who can provide the homeless provider with assistance on how to complete the questionnaire.

(4) HHS must provide with the environmental questionnaire information on how applicants can obtain environmental information that is within the defendants' possession.

(5) HHS must, if necessary, provide assistance to applicants in obtaining environmental information that is within the defendants' possession.

(6) HHS must allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement.

(7) Defendants must initiate an outreach program that provides direct information to homeless providers on the properties that are available in their localities.

And it is further

ORDERED that the defendants must take the above actions within forty-five days of this Order; and it is further

ORDERED that all other relief requested by the plaintiffs is denied.

## ON MOTION TO ALTER OR AMEND

On February 13, 1991, this Court issued a decision granting in part, and denying in part, plaintiffs' motion for further injunctive relief. *See National Law Center on Homelessness and Poverty v. United States Veterans Administration,* Civil Action No. 88–2503 (D.D.C. February 13, 1991) ("Decision of February 13, 1991"). As part of the decision, the Court directed that the Department of Health and Human Services ("HHS") accept a statement of intent to apply for Title IV funds as a sufficient financial showing to apply for McKinney Act property. Defendants now seek to alter or amend that portion of the judgment, arguing that the Court's decision will effectively prevent HHS from acting in accordance with funding regulations that it must apply when leasing surplus federal property under Title V. In addition, at the hearing on this motion, plaintiffs moved the Court to establish a final date for defendants to promulgate regulations implementing the Stuart B. McKinney Homeless Assistance Amendments Act of 1990. Both motions are now before Court.

I. *Motion to Alter or Amend the Judgment of February 13, 1991*

Prior to the Court's Decision of February 13, 1991, HHS refused to accept an intent to seek funding under Title IV as a sufficient financial showing unless the applicant also identified an alternative source of funding. The defendant's principal argument for this policy was that Title IV funds are very limited.

The Court's Decision of February 13, 1991 rejected this argument. The Court found that the limited nature of the funds was not a satisfactory basis for requiring an alternative source of funding. Decision of February 13, 1991, at 11. The Court concluded that, if the Title IV funds did not become available and an alternative source of funding could not be found, then the property could revert to the General Services Administration ("GSA"). *Id.*

In this motion, defendants argue that the Court's Decision of February 13, 1991 conflicts with their obligations under 45 C.F.R. part 12. These regulations require that Title V lessees demonstrate their ability to assume immediate insurance and maintenance costs on leased Title V property.

The Court finds that nothing in its Decision of February 13, 1991 conflicts with the government's obligations under 45 C.F.R. part 12. The Court's decision was that an intent to apply for Title IV funds was a sufficient financial showing to apply for vacant federal property. As such, the defendants cannot reject an application on the basis that an alternative source of funding has not been identified. If the application is approved and the Title IV funds do not become available, the plaintiffs must be given a reasonable amount of time to find alternative funding. If the funding does not become available, the property would then revert to GSA.

The defendants' brief suggests that the Court's decision will require the government to sign leases with applicants whose leases it will have to rescind if the applicants' Title IV funding does not become available. The Court is unpersuaded that its decision requires such a result. Consistent with the Court's decision, HHS can approve the application and either refrain from entering into a final lease until alternative funding is available or enter into a conditional lease that does not transfer possession until the alternative funding becomes available.

II. *Motion to Establish a Final Date for the McKinney Act Regulations*

On November 29, 1990, Congress enacted the Stuart B. McKinney Homeless Assist-

ance Amendments Act of 1990. *See* Pub.L. No. 101–645 (to be codified at 42 U.S.C. § 11411 *et seq.*) ("1990 Amendments"). The 1990 Amendments allowed the defendants until February 27, 1991 to issue regulations implementing the 1990 Amendments.

The defendants contend that they were unable to meet this date because the Court's Decision of February 13, 1991 required additional work to ensure that the regulations were consistent with the Court's decision. It has now, however, been over two months since the original deadline, and the defendants have yet to issue regulations. Although the Court recognizes that its Decision of February 13, 1991 might have required some additional work to complete the regulations, this is no justification for indefinitely delaying the regulations. Accordingly, the Court establishes May 27, 1991, three months from the original February 27, 1991 date, as a final date for defendants to issue regulations.

Wherefore, upon consideration of the defendants' motion to alter or amend the judgment of February 13, 1991, plaintiffs' motion to set a final date for defendants to promulgate regulations, the opposition thereto, the arguments of counsel in open Court, the entire record herein, and for the above-noted reasons, it is by the Court this 2nd day of May, 1991,

ORDERED that defendants' motion be, and hereby is, denied; and it is further

ORDERED that plaintiffs' motion be, and hereby is, granted; and it is further

ORDERED that defendants have until May 27, 1991 to issue regulations implementing the Stuart B. McKinney Homeless Assistance Amendments Act of 1990.