NATIONAL LAW CENTER ON HOME-
LESSNESS AND POVERTY, et al.,
Plaintiffs,

v.

UNITED STATES VETERANS
ADMINISTRATION, et al.,
Defendants.

Civ. A. No. 88–2503–OG.

United States District Court,
District of Columbia.

April 21, 1993.

Phyllis Thompson and Jonathan T. Foot, Covington & Burling, and Maria Foscarinis, National Law Center on Homelessness and Poverty, Washington, DC, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Felix V. Baxter and Carlotta P. Wells, Dept. of Justice, Washington, DC, for defendants.

MEMORANDUM

GASCH, District Judge.

This matter is before the Court on plaintiffs' motion to modify and further enforce the permanent injunction which this Court issued on December 15, 1988, and defendants' response thereto. The permanent injunction ordered defendants to comply with section 501 of the Stewart B. McKinney Homeless Assistance Act, codified at 42 U.S.C. § 11411, which requires defendants to make vacant federal properties available to assist the homeless. This Court has further enforced the injunction on two occasions. *See National Law Center on Homelessness and Poverty v. United States Veterans Admin.*, 765 F.Supp. 1 (D.D.C.1991); *id.* at 13 (on defendants' motion to alter or amend). While these enforcement decisions were pending, Congress passed the Stewart B. McKinney Homeless Assistance Amendments Act of 1990, Pub.L. No. 101–645, § 401, 104 Stat. 4719 (1990), which modified the procedure by which defendants make properties available to homeless providers. Plaintiffs now ask the Court to order further injunctive relief and to modify the permanent injunction consistent with the recent amendments. Plaintiffs' proposed modifications are set forth in a Proposed Order. Defendants object to paragraphs 2, 3, 4, 6, 10, 14, 15, 16 and 17 of plaintiffs' Proposed Order.[1] The Court will address each of the contested proposed modifications in turn.

1. Comprehensive Quarterly Canvassing (Proposed Order ¶ 2)

■ The 1990 Amendments to the McKinney Act provide, in pertinent part, that

[t]he Secretary of Housing and Urban Development ["HUD"] shall, on a quarterly basis, request information from each landholding agency regarding Federal public buildings and other Federal real properties (including fixtures) that are excess property or surplus property or that are described as unutilized or underutilized in surveys by the heads of landholding agencies under section 483(b)(2) of Title 40 [The Federal Property and Administrative Services Act of 1949].

42 U.S.C. § 11411(a) (1990). Defendants contend that each quarterly canvass should be supplemental rather than comprehensive *i.e.*, HUD should be required to report only those excess, surplus, unutilized or underutilized properties which have changed in status or classification since the last quarter. Plaintiffs maintain that comprehensive quarterly canvassing is required. However, in an effort to accommodate defendants, plaintiffs have proposed comprehensive quarterly canvassing in the first and third quarters only.

The question whether HUD's quarterly canvass must be comprehensive or supplemental is not new to this Court. Indeed, the same arguments advanced in the motion *sub judice* were presented to the Court when it was asked to interpret and further enforce its permanent injunction. *See National Law Center on Homelessness and Poverty v. United States Veterans Admin.*, 765 F.Supp. at 6–7. There, this Court found "that its Permanent Injunction requires the government to perform a comprehensive canvass every quarter. The language of the injunction could not be more clear—HUD shall 'canvass all land-holding agencies quarterly'." *Id.* at 6.[2]

Although the statutory language does vary slightly from the language of this Court's permanent injunction (compare 42 U.S.C. § 11411(a), *supra*, with footnote 2), the plain meaning has not changed. The only possibly relevant distinction between this Court's per-

---

**1.** After defendants filed their response to plaintiffs' motion, plaintiffs submitted a revised Proposed Order. The new order omits ¶ 16, and revises ¶ 3, so that these portions are no longer in dispute. Accordingly, this Memorandum does not address defendants' initial objections to language which has either been omitted from the Proposed Order or revised to defendants' satisfaction.

**2.** The permanent injunction provides in ¶ B(2): "HUD shall canvass all land-holding agencies quarterly to collect information about unused or underused federal property. HUD's canvass shall include, but not be limited to, collection of information regarding all property declared excess or surplus and all properties declared unutilized or underutilized in surveys made pursuant to 40 U.S.C. § 483(b) and 41 C.F.R. § 101–47.-802(a) or Executive Order 12512 and 41 C.F.R. § 101–47.802(b)."

manent injunction and the statutory language is the latter's reference to "each landholding agency" as opposed to "all landholding agencies." But this distinction is an insufficient basis for this Court to conclude that Congress intended supplemental quarterly canvassing rather than comprehensive canvassing. If Congress had intended supplemental quarterly canvassing, it would have said so.

Nevertheless, the Court is mindful that the comprehensive quarterly canvassing requirement has been a constant source of complaint. Defendants contend that the comprehensive quarterly canvassing requirement frustrates the efforts of the General Service Administration ("GSA") to dispose of surplus property, as required by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 484 (1984).[3] Although plaintiffs continue to believe that defendants' argument for supplemental canvassing lacks merit, they have proposed a compromise.

■ Plaintiffs propose comprehensive canvassing in the first and third quarters, and supplemental canvassing in the second and fourth quarters. See Proposed Order at ¶ 2. Under this scheme, defendants need only report, in the second and fourth quarters, property not identified in the prior quarter's canvass, or property that was included but has changed in status. The Court finds that plaintiffs' proposal is a reasonable one. Clearly, defendants' argument for supplemental canvassing in every quarter is contrary to the plain meaning of the statute and this Court's prior interpretation of the permanent injunction. However, the Court is reluctant to require comprehensive canvassing in every quarter if the parties agree that comprehensive canvassing in each alternative quarter will achieve the same end, namely, to make homeless providers aware of suitable, available federal properties. In short, plaintiffs have proposed a fair and reasonable *via media*, and the Court will adopt ¶ 2 of the Proposed Order.

## 2. Reporting Back to HUD (Proposed Order ¶ 4)[4]

■ The 1990 Amendments further provide:

> No later than 25 days after receiving a request [from HUD for information on excess, surplus, unutilized or under-utilized properties], the head of each landholding agency shall transmit such information to [HUD].

42 U.S.C. § 11411(a). Defendants argue that plaintiffs' proposed ¶ 4 should be rejected because there is no evidence that non-party land-holding agencies have violated their duties under section 501 of the McKinney Act. What defendants have failed to realize, however, is that "each" federal land-holding agency has a statutory duty to report back to HUD within a certain time period. Because plaintiffs' proposed modification is virtually identical to the above-quoted statutory language, proposed ¶ 4 will be adopted in full.

## 3. Publication in the *Federal Register* (Proposed Order ¶ 6)

■ The permanent injunction requires HUD to publish a list of suitable properties in the *Federal Register* on a weekly basis. Since the date of the issuance of the permanent injunction, it has become clear that it would be more beneficial to homeless providers if HUD were to publish only those properties that are both suitable *and* available.

---

**3.** When HUD includes all suitable and available surplus property in each quarterly canvass, it must publish a list of these properties in the Federal Register. *See* 42 U.S.C. § 11411(c)(1)(A)(ii). As a consequence, these properties may not be made available for any other purpose for sixty days after the date of publication. *Id.* at § 11411(d)(1). Because it takes months for GSA to sell surplus property, defendants contend that GSA cannot realistically comply with its statutory duty to dispose of surplus federal property which has been reported by HUD. *See* Defendants' Memorandum In Response To Plaintiffs' Motion To Modify And Further Enforce The Injunction ("Defendants' Response") at 15–16.

**4.** Although defendants do not contest proposed ¶ 5, it is worthy to note that this proposed modification incorporates the 1990 Amendments' requirement that HUD make its suitability determinations within thirty days after receipt of available property information from the land-holding agencies. *See* 42 U.S.C. § 11411(a). The permanent injunction, which allowed HUD sixty days to act, will be modified accordingly.

See *National Law Center on Homelessness and Poverty v. United States Veterans Admin.*, 765 F.Supp. at 7–8. Moreover, the 1990 Amendments specifically require HUD to indicate which properties are available for use by the homeless. 42 U.S.C. § 11411(c)(1)(A)(ii). Thus, consistent with the 1990 Amendments, the Court will modify its injunction to the extent that HUD must report only those properties that are both suitable and available.

Question has also been raised whether the Court should continue to require HUD to publish in the *Federal Register* on a weekly basis. Defendants argue that the 1990 Amendments require quarterly publication. Notwithstanding this argument, defendants appear willing to continue to publish on a weekly basis. In any event, plaintiffs do not insist on weekly publication, but have indicated their support for a compromise which would allow for weekly publication but would require a minimum of monthly publication. *See* Plaintiffs' Reply To Defendants' Response To Plaintiffs' Motion To Modify And Further Enforce The Permanent Injunction ("Plaintiffs' Reply") at 12.

The Court will adopt plaintiffs' recommendation of monthly publication. Contrary to defendants' argument, the 1990 Amendments do not require quarterly publication; rather, they set a time period within which a given property must be published in the *Federal Register*. *See* 42 U.S.C. 11411(c)(1)(A) ("No later than 15 days after the last day of the 45 day period [within which land-holding agencies must transmit information on available property to HUD] the Secretary [of HUD] shall publish in the Federal Register"). And as plaintiffs point out, this time limitation by no means prohibits the Court from requiring more frequent publication. In addition, the Court finds that monthly publication is appropriate because it would allow HUD some flexibility in the event weekly publication becomes impracticable. If HUD decides to change over to monthly publication, it must give plaintiffs 90 days' notice prior to the effective date and must also publish notice of the change in the *Federal Register*. Finally, the Court urges HUD to continue with its current practice of weekly publication.

### 4. The Application Package (Proposed Order ¶ 10)

 Homeless providers may submit an application to the Secretary of Health and Human Services ("HHS") for any property that is published in the *Federal Register*. 42 U.S.C. § 11411(e)(1). Plaintiffs now ask the Court to modify its permanent injunction to the extent that HHS must provide certain information in the application packet to assist homeless providers with the filing of applications. Specifically, plaintiffs propose that HHS include with each application for property: 1) a notice identifying the National Law Center for Homelessness and Poverty as an organization available to assist in the application process (including the telephone number of the National Law Center); 2) notice that HHS staff are available to assist homeless providers in the application process (including the telephone number of the relevant staff persons); 3) a fact sheet describing possible funding sources; and 4) notice that the Interagency Council on Homelessness may be able to help identify possible sources of funding (including the Interagency Council's telephone number). Defendants object to plaintiffs' first and third proposals.

Defendants argue that it would be improper for HHS to include the name and telephone number of plaintiff National Law Center in the application packet because to do so would show bias in favor of the National Law Center and would disadvantage other homeless assistance organizations. Defendants' argument ignores the fact that the National Law Center is a nonprofit organization, the purpose of which is to assist the homeless. In that regard, the National Law Center, if identified in the application packet, would merely further the common goal of all homeless assistance organizations by helping homeless providers complete the application process. In short, the Court would rather include the name of at least one homeless organization, and thereby further the goals of the McKinney Act, than not include that information under the guise of neutrality.

Defendants also argue that HHS should not be required to prepare a list of possible funding sources to accompany the application

packet. The Court agrees with this argument. As defendants point out, HHS is not familiar with state, local and private sources of funding. Moreover, HHS has agreed to include in the application packet a statement that the *Federal Programs to Help Homeless People* publication is available from the Interagency Council. This publication contains information on over one hundred federal programs available to assist the homeless. Access to this publication would serve the end of putting homeless providers into contact with potential funding sources. Thus, the Court will modify its permanent injunction to the extent that HHS must include a statement indicating the availability of this publication and also the Interagency Council's telephone number.

### 5. The Financial Showing Requirement (Proposed Order ¶ 14)

Proposed Order ¶ 14 provides that "HHS must allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement." This language remains unchanged from this Court's February 13, 1991, Order at ¶ 6, in which the Court further enforced the permanent injunction. Defendants complain that this language should be modified in light of the Court of Appeals' decision in *National Law Center on Homelessness and Poverty v. United States Department of Veterans Affairs*, 964 F.2d 1210 (D.C.Cir.1992). There, the Court of Appeals held that an applicant's intent to apply for funds "require[s] only that HHS give *qualified approval* to a wholly unfunded otherwise acceptable application for surplus property." *Id.* at 1212 (emphasis in original). That is, HHS must certify that the applicant could legitimately receive the requested property, but for the fact that the applicant lacks sufficient financial resources. *Id.* at 1213.

The Court does not find it necessary to incorporate the appellate court's interpretation of the February 13, 1991, Order, into the permanent injunction itself. The Court of Appeals not only interpreted this Court's

February 1991 Order (the second enforcement decision), it also affirmed that Order. Thus, ¶ 6 of the February 13, 1991, Order, which contains the same language proposed by plaintiffs in Proposed Order ¶ 14, has been specifically upheld by the Court of Appeals. While this Court adopts the Court of Appeals' interpretation of the February 1991 order, it need not, absent remand and specific instructions from the Court of Appeals, change the language of the injunction. Therefore, Proposed Order ¶ 14 will be adopted in full.

### 6. Outreach (Proposed Order ¶ 15)

The Court has previously ordered defendants to "initiate an outreach program that provides direct information to homeless providers on the properties that are available in their localities." Order of February 13, 1991, at ¶ 7. Plaintiffs do not now argue that defendants are in total derogation of the court's prior order. Instead, plaintiffs argue that while defendants' efforts have improved, they have still not implemented adequate measures to reach out and spread information about the McKinney Act. *See* Plaintiffs' Reply at 5. Thus, plaintiffs propose a variety of new outreach measures.

■ Plaintiffs' first new outreach proposal concerns the dissemination of lists of available properties to homeless providers. Specifically, plaintiffs propose that defendants, in addition to reporting suitable and available properties in the *Federal Register*, mail lists of these properties to homeless providers and also publicize the availability of these properties in local newspapers and periodicals. *See* Proposed Order ¶ 15(a). Defendants maintain that they already undertake a variety of efforts to directly inform homeless providers and the general public about Title V of the McKinney Act and the availability of suitable properties. *See* Defendants' Response at 24. The Court finds that defendants have in fact implemented a variety of measures to disseminate information about the McKinney Act and to inform homeless providers of the availability of specific properties.[5] The addi-

---

5. The various information distribution activities undertaken by defendants and the Interagency Council on Homelessness include, *inter alia:* 1)

The Interagency Council forwards copies of area-relevant suitability notices to regional coordinators and state contacts who disseminate the in-

tional publication and mailing measures advocated by plaintiffs, while perhaps helpful, would be, for the most part, supplemental to very similar measures which are already in place. Therefore, plaintiffs' Proposed Order ¶ 15(a) will be rejected.

■ Plaintiffs' second proposed outreach activity pertains to military base closures. Plaintiffs propose that defendants sponsor, in each community where a base closure is scheduled, a seminar to educate potential property applicants about the McKinney Act and how to apply for the property. *See* Proposed Order ¶ 15(b). Defendants object on the ground that the Department of Defense (the "DoD") already engages in outreach efforts in connection with base closures. The Court has reviewed defendants' alleged outreach efforts and finds that they are insufficient to educate homeless providers in communities affected by base closures about the operation of the McKinney Act.

Defendants claim that members of the Base Closure and Realignment Office within the Army Corps of Engineers routinely meet with potential property applicants and also participate in regional meetings sponsored by the Interagency Council on Homelessness. *See* Defendants' Response at 28; Declaration of Gary Paterson at ¶ 6. In addition, defendants submit that "DoD personnel are accessible for purposes of providing information about available base closure properties." Defendants' Response at 28. But, in this Court's view, the DoD's "accessibility" and

its participation in meetings sponsored by other organizations do not constitute outreach to homeless providers. Under this Court's prior Order, defendants are required to *"initiate* an outreach program that provides direct information to homeless providers." Order of February 13, 1991, at ¶ 7 (emphasis added). Clearly, the Base Closure and Realignment Office of the DoD has yet to initiate or sponsor an outreach program. Rather, it merely responds to inquiries and attends meetings sponsored by the Interagency Council on Homelessness.

In a similar vein, defendants argue that the DoD's Office of Economic Adjustment ("OEA") provides information on the McKinney Act to local communities and organizations which are affected by base closures. Defendants' Response at 28. However, this information is only provided "at the community's request." Declaration of Paul J. Dempsey at ¶ 5. In light of the fact that local communities, if anything, seek to prevent homeless people from moving into their communities,[6] it is not enough for OEA simply to respond to local communities' requests for information on the McKinney Act. Moreover, it is not enough for the OEA to merely "encourage" local communities to canvass local homeless providers. *See* Defendants' Response at 29; Declaration of Paul J. Dempsey at ¶ 5. Rather, the DoD has a duty to "initiate" seminars and dialogue and to disseminate McKinney Act information to homeless providers and local communities. Be-

formation to organizations serving homeless people; 2) The Interagency Council convenes regional workshops for homeless providers in which staff explains the operation of Title V of the McKinney Act and informs the participants of the availability of properties; 3) The Interagency Council has issued two publications outlining the basics of the McKinney Act program, which have been distributed to over 30,000 organizations; 4) The Interagency Council has published a manual entitled *Federal Programs to Help Homeless People,* which provides information on federal funding sources for the homeless; 5) HUD prepares a "Fact Sheet" on Title V, which it sends to all interested parties; 6) HUD sends lists of suitable and available properties published in the *Federal Register* to homeless organizations which are located in the same geographical area as the published properties; 7) HUD holds regional seminars or workshops on the homeless where it distributes McKinney Act information; 8) HUD

has established a marketing program designed to bring suitable properties to the attention of homeless providers; 9) GSA mails notices of suitable and available properties to state and local governments, homeless assistance organizations, the Governor in the state where the suitable and available property is located, the state Homeless Coordinator and local officials, such as the mayor and county clerk; 10) GSA also sends notice of available property to the post offices in the area where the property is located, the state capitol building and local government buildings. *See* Defendants' Response at 23–28.

6. One example, with which defendants are familiar, is the controversy in New Hempstead and Orangetown, New York, where local community groups obtained state court injunctions blocking the execution of leases on McKinney Act properties.

cause defendants and the DoD have not complied with this duty, plaintiffs' Proposed Order ¶ 15(b) will be adopted in full.

■ Plaintiffs have also asked the Court to modify the permanent injunction to the extent that "[d]efendants shall post, in all federal buildings in towns or cities with a population over 50,000, an informational flyer describing the McKinney Act program." Proposed Order ¶ 15(c). GSA, however, already sends notice of available property to post offices and court buildings in the geographic area where the particular property is located, and also requests that such notices be posted. *See* Defendants' Response at 30. Hence, the outreach measure proposed by plaintiffs, although broader in scope, is already in place. In addition, the Court finds that it would be a waste of resources to compel defendants to post general information flyers in every community with a population over 50,000. Many of these communities have not experienced homelessness and, therefore, would not benefit from receipt of the flyer. In short, plaintiffs' Proposed Order ¶ 15(c) is unnecessary and, therefore, it will be rejected.

Finally, in Proposed Order ¶ 15(d), plaintiffs ask the Court to modify the permanent injunction to the extent that "[d]efendants shall initiate and execute a marketing program for McKinney Act properties." By plaintiffs' own concession, however, defendants have implemented a marketing program. *See* Plaintiffs' Reply at 4–5. Although plaintiffs complain that defendants' marketing program is inadequate, the Court finds it to be reasonably capable of drawing attention to McKinney Act properties. Therefore, Proposed Order ¶ 15(d) will be rejected.

### 7. Monthly Reports (Proposed Order ¶ 17)

Presently, GSA, HUD and HHS must submit to the Court and to plaintiffs' counsel a monthly report identifying properties determined by HUD to be suitable and unsuitable, properties made available to assist the homeless, and those properties sold, transferred or otherwise disposed of. Order of December 13, 1988, at ¶ C(1). Since the date of the issuance of the permanent injunction, it has become clear that the monthly report is, to say the least, voluminous. To reduce defendants' burden of production, plaintiffs seek to modify the permanent injunction to the extent that defendants need not identify all suitable and unsuitable properties in the monthly report which are reported in the *Federal Register* in any event. Moreover, plaintiffs propose that defendants be required only to submit the monthly report to plaintiffs' counsel—not the Court. *See* Proposed Order ¶ 17. Defendants do not dispute these proposed modifications; moreover, the Court finds them to be reasonable, and they will be implemented.

■ Plaintiffs propose some additional modifications to defendants' monthly reporting requirement. Specifically, plaintiffs ask the Court to require defendants GSA, HUD and HHS to submit to plaintiffs' counsel a monthly report identifying: 1) those properties made available to the homeless, including properties made available through an agency other than GSA, HUD or HHS (Proposed Order ¶ 17(i)); 2) those properties sold, transferred or otherwise disposed of (Proposed Order ¶ 17(ii)); and 3) all persons and organizations that have contacted defendants to express interest in applying for McKinney Act property, including the date of the contact and identifies the property which was the subject of the inquiry (Proposed Order ¶ 17(iii)).

Defendants only object to the requirement in proposed ¶ 17(i) that they include in the monthly report properties made available by agencies other than GSA, HUD and HHS. Defendants have not, however, offered a good reason why they cannot include in the monthly report properties made available through another agency. As plaintiffs point out, HHS must process every application for McKinney Act property and, therefore, has ready access to information on properties made available by other agencies. More importantly, the permanent injunction requires GSA, HUD and HHS to include in the monthly report "those properties made available to assist the homeless." Order of December 13, 1988, at ¶ C(1)(iii). The plain meaning of this order does not restrict the identification of properties in the monthly

report to those properties made available by GSA, HUD and HHS only. In short, because Proposed Order ¶ 17(i) is a reasonable clarification of defendants' monthly reporting requirements, it will be adopted along with Proposed Order ¶¶ 17(ii) and (iii).

## CONCLUSION

In summary, the Court believes that defendants' implementation of the McKinney Act has improved since the Court issued its permanent injunction. However, defendants have not fully complied with their obligations under the McKinney Act. Moreover, the passage of the 1990 Amendments and other changes in circumstances warrant some of the modifications to the permanent injunction which have been proposed by plaintiffs. An appropriate order detailing the modifications which have been adopted by the Court will be issued.

## ORDER

Upon consideration of plaintiffs' motion to modify and further enforce the permanent injunction, defendants' response thereto, and for the reasons set forth in the accompanying Memorandum, it by the Court this 21st day of April, 1993,

ORDERED that the Court's Orders filed on December 13, 1988, May 22, 1989, February 13, 1991, and May 2, 1991, be, and they hereby are, modified and consolidated as set forth below:

I. *Canvassing and Reporting Procedures*

1) Land-holding agencies shall review their property holdings at least annually pursuant to 40 U.S.C. § 483(b) and 41 C.F.R. § 101–47.802(a).

2) HUD shall canvass all land-holding agencies quarterly to collect information about unused or underused federal property. HUD's canvass shall include, but not be limited to, collection of information regarding all property declared excess or surplus and all properties declared unutilized or underutilized in surveys made pursuant to 40 U.S.C. § 483(b) and 41 C.F.R. § 101–47.802(a) or Executive Order 12512 and 41 C.F.R. § 101–47.802(b). The first and third such quarterly

canvasses of each calendar year shall be comprehensive; the second and fourth quarterly canvasses of the same calendar year may be supplemental quarterly canvasses to determine whether land-holding agencies have property that is unutilized, underutilized, excess or surplus, but was not identified in the prior quarter's comprehensive canvass, or was included in the prior quarter's comprehensive canvass but has had a change in status.

3) HUD's canvassing letters must indicate that HUD, and not the land-holding agency, is to make all suitability determinations.

4) Land-holding agencies shall report to HUD, no more than 25 days after receiving HUD's request for information, any and all excess, surplus, unutilized, or underutilized properties owned or controlled by the agencies.

5) HUD shall make suitability determinations of properties identified as surplus, excess, unutilized or underutilized within 30 days after receiving the land-holding agency's canvass response.

6) HUD shall publish a list of suitable and available properties in the *Federal Register* and shall provide a copy of the list to plaintiffs' counsel. HUD must publish this list, at a minimum, once per month. HUD may, however, continue its current practice of weekly publication in the *Federal Register* if it is practicable. In the event HUD decides to change over to monthly publication, it must give plaintiffs 90 days' notice prior to the effective date of the change and must also publish notice of the change in the *Federal Register.*

II. *Application Process*

7) Properties identified in the *Federal Register* as suitable and available shall not be available for any other purpose for at least 60 days from the date of publication. If a written notice of intent to apply for such property is received by the Secretary of Health and Human Services within 60 days of publication, such property may not be made available for any other purpose until HHS has completed action on an application for property. Applications shall be submitted within

90 days of the written notice of intent to apply; HHS shall, with the concurrence of the appropriate land-holding agency, extend this period upon reasonable request by the applicant.

8) HHS shall accept and process all applications for property deemed suitable and available by HUD pursuant to the McKinney Act.

9) HHS shall complete its action on the application within 25 days of receipt of a completed application. This period may be extended by agreement of HHS and the applicant. HHS shall make and maintain a written record of all actions taken in response to an application.

10) HHS must provide with each application packet sent to interested persons a notice identifying the plaintiff National Law Center on Homelessness and Poverty, giving the National Law Center's telephone number and stating its availability to assist homeless providers in resolving any problems that may arise in the application and leasing processes. HHS must also include notice in the application material that HHS staff persons are available to assist in the application process, and the telephone number that the applicant may call to obtain that assistance. In addition, HHS must include notice that the Interagency Council on Homelessness may be able to help identify possible sources of funding, including the telephone number of the Council. HHS must indicate that the *Federal Programs to Help Homeless People* publication is available from the Interagency Council.

11) HHS must provide with the environmental questionnaire the identity of a direct reference person who can provide the homeless provider with assistance on how to complete the questionnaire.

12) HHS must provide with the environmental questionnaire information on how applicants can obtain environmental information that is within defendants' possession.

13) HHS must, if necessary, provide assistance to applicants in obtaining environmental information that is within the defendants' possession.

14) HHS must allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement.

III. *Outreach*

15) Defendants must initiate an outreach program that provides direct information to homeless providers on the properties that are available in their localities. As part of this program, defendants shall sponsor, in each community where there is a military base closure scheduled, a workshop or seminar to educate potential applicants about the McKinney Act program and how to apply for property. Defendants shall advertise and promote the holding of such workshop or seminar to reasonably inform those persons and groups who might be interested in the workshop or seminar. Such workshop or seminar shall be held reasonably prior to the availability of the base closure property under the McKinney Act to permit timely application.

16) GSA, HUD and HHS shall submit to plaintiffs' counsel a monthly report identifying for each month: a) those properties made available to assist the homeless, including the status of all applications submitted and pending, even if the property is made available by an agency other than GSA, HUD and HHS; b) those properties sold, transferred or otherwise disposed of; and c) all persons and organizations that have contacted defendants to inquire about applying for any property under the McKinney Act program, the date of the contact and the property which was the subject of the inquiry. GSA, HUD and HHS shall also file with the Court, each month, a certificate that the monthly report has been prepared and delivered to plaintiffs' counsel.

17) Jurisdiction is retained for the purposes of enabling any of the parties to seek such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Decree, for the modification of any of the provisions thereof, for the enforcement of compliance and punishment of violations thereof, and to determine

the costs and attorneys' fees that may be recovered by plaintiffs.